UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

LEAGUE OF WOMEN VOTERS OF
CALIFORNIA, ACCE INSTITUTE,
CALIFORNIA COMMON CAUSE, and
NATIONAL COUNCIL OF LA RAZA,

Plaintiffs,

v.

BRIAN P. KELLY, Secretary of the
California Transportation Agency, JEAN
SHIOMOTO, Director of the California
Department of Motor Vehicles, and ALEX
PADILLA, California Secretary of State,

Defendants.

Case No. 17-cv-02665-LB

**ORDER GRANTING IN PART AND
DENYING IN PART THE
DEFENDANTS' MOTION TO DISMISS**

Re: ECF No. 21

**INTRODUCTION**

The plaintiffs — all non-profit organizations — challenge California's implementation of the

National Voter Registration Act of 1993 ("NVRA" or "Act"). 52 U.S.C. § 20501 *et seq.*[1] The Act

generally requires the California Department of Motor Vehicles ("DMV") to offer citizens an

opportunity to register to vote when they apply for or renew a driver's license or a state-issued

---

[1] *See generally* Compl. – ECF No. 1. Record citations refer to material in the Electronic Case File
("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

identification card. 52 U.S.C. §§ 20503(a), 20504(a). California implements the Act by sending a separate voter-registration form (returnable to the Secretary of State) with the DMV form (returnable to DMV).[2] The plaintiffs claim that the process — which requires citizens to fill out information on the separate voter-registration form that duplicates information on the DMV form — violates the Act's requirements of (1) a "[s]imultaneous application for voter registration and application for motor vehicle driver's license," and (2) a voter-registration application that does "not require any information that duplicates information required in the driver's license portion of the form" other than a second signature and an attestation of eligibility to vote. *Id.* § 20504(c)(2).[3] They seek declaratory and injunctive relief.[4]

The state officials move to dismiss the complaint on the grounds that the plaintiffs lack standing, res judicata bars the lawsuit, and the plaintiffs do not state a plausible claim for relief.[5] The court denies the motion to dismiss for lack of direct standing, grants the motion to dismiss for lack of associational standing with leave to amend, denies the motion to dismiss for failure to state a claim, and defers consideration of res judicata pending any amended complaint.

**STATUTORY FRAMEWORK**

Congress passed the NVRA in 1993 for four purposes:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
>
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
>
> (3) to protect the integrity of the electoral process; and
>
> (4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b)(1)–(4).

---

[2] Ex. 12 to Request for Judicial Notice ("RJN") – ECF No. 23-12.

[3] Compl. – ECF No. 1 at 9–10 (¶¶ 37–42).

[4] *Id.* at 11–12 (¶¶ 47–53).

[5] Notice of Motion to Dismiss – ECF No. 21 at 2; Defendants' Supporting Brief– ECF No. 22 at 6–7.

ORDER – No. 17-cv-02665-LB          2

United States District Court
Northern District of California

When passing the Act, Congress found that: (1) the right to vote is a fundamental right; (2) it is the duty of federal, state, and local governments to protect that right; and (3) "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(1)–(3).

To increase voter registration, the NVRA requires states to establish procedures for voter registration "by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 20504 of this title." *Id.* § 20503(a)(1). Section 20504 is titled "Simultaneous application for voter registration and application for motor vehicle driver's license." Its relevant sections are as follows:

**(a) In general**

**(1)** Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application.

**(2)** An application for voter registration submitted under paragraph (1) shall be considered as updating any previous voter registration by the applicant.

\*          \*          \*

**(c) Forms and procedures**

**(1)** Each State shall include a voter registration application form for elections for Federal office as part of an application for a State motor vehicle driver's license.

**(2)** The voter registration application portion of an application for a State motor vehicle driver's license —

   **(A)** may not require any information that duplicates information required in the driver's license portion of the form (other than a second signature or other information necessary under subparagraph (C));

   **(B)** may require only the minimum amount of information necessary to —

      **(i)** prevent duplicate voter registrations; and

      **(ii)** enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

   **(C)** shall include a statement that —

      **(i)** states each eligibility requirement (including citizenship);

      **(ii)** contains an attestation that the applicant meets each such requirement; and

**(iii)** requires the signature of the applicant, under penalty of perjury[.]

\*　　　\*　　　\*

**(d) Change of address**

Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

**(e) Transmittal deadline**

**(1)** Subject to paragraph (2), a completed voter registration portion of an application for a State motor vehicle driver's license accepted at a State motor vehicle authority shall be transmitted to the appropriate State election official not later than 10 days after the date of acceptance.

**(2)** If a registration application is accepted within 5 days before the last day for registration to vote in an election, the application shall be transmitted to the appropriate State election official not later than 5 days after date of acceptance.

## STATEMENT

### 1. California's Current Renewal-by-Mail Process

A driver who is eligible to renew by mail receives a packet that includes (1) a renewal-by-mail form returnable to DMV; and (2) a separate voter-registration form returnable (postage prepaid) to the Secretary of State.[6] The packet is attached to this order as Exhibit 1; the court grants the defendants' request to take judicial notice of it. Fed. R. Evid. 201(b)(2); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004). The DMV form is pre-printed with the driver's identification information: name, address, and driver's license number.[7] The driver must provide any new adverse health or vision information, may register as an organ donor, and must sign the form.[8] The front of the DMV form also states:

> Have you moved? For Renewal by Mail, check one of the boxes on the back and complete the change of address information. Your new address will appear on your license. It is not necessary to visit a DMV Office.
>
> - If you wish to register to vote or if you have moved to a *new county*, you

---

[6] Ex. 12 to RJN – ECF No. 23-12; *see also* Ex. B. to Compl. – ECF No. 1-2.

[7] Ex. 12 to RJN – ECF No. 23-12 at 2.

[8] *Id.*

> must complete a new Voter Registration postcard (enclosed) and mail it to the Secretary of State.

> • If you are registered to vote and have moved within the **same county**, you may use this form to change your voter address.

On the voter-registration form, an applicant must check a "yes" or "no" box to indicate whether he or she is (1) a citizen and California resident and (2) age 18 or older or (3) "age 16 or 17 and want to pre-register."[9] The applicant must fill in the following fields: name, address, mailing address, date of birth, California driver's license or ID card number (or alternatively, the last four digits of the social-security number), email (optional), party preference (optional), request to receive ballot by mail (optional), and the name and address used for any previous voter registration or preregistration.[10] The voter must sign the form and may opt to be a poll worker or provide demographic information.[11]

### 2. Prior Legal Challenge to California's Renewal-by-Mail Process

In August 1994, California Governor Pete Wilson issued an Executive Order requiring state agencies to implement the NVRA by using federal funds only.[12] A coalition of non-profit organizations — including the League of Women Voters of California and California Common Cause (plaintiffs here) — and three individual plaintiffs (on behalf of a class of California voters) filed a lawsuit raising violations of the NVRA.[13] The plaintiffs claimed (among other violations) that the forms and procedures did not comply with the NVRA (in part) because the DMV forms would not "serve as voter registration forms."[14] "Instead, by-mail renewal applicants will receive a separate voter registration form with the license renewal application which must be separately

---

[9] *Id.* at 4.

[10] *Id.*

[11] *Id.*

[12] Compl. in *Voting Rights Coalition v. Wilson*, No. 94-CV-20860-JW (lodged in the record here as Ex. 1 to RJN, ECF No. 23-1 at 5 (¶ 2) (citing Exec. Order No. V-98-94)). The court takes judicial notice of the court records from the previous lawsuit. *See Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988).

[13] Compl. in *Voting Rights Coalition v. Wilson* – ECF No. 23-1 at 7–8 (¶¶ 13–20).

[14] *Id.* at 14–16 (¶¶ 43, 45).

1    executed and mailed to the Secretary of State."[15] California then sued the federal government,

2    challenging the NVRA under the Tenth Amendment, and the federal government counter-sued for

3    an injunction to compel California's compliance with the NVRA.[16] The district court consolidated

4    these cases.[17]

5        In March 1995, the district court (1) certified the proposed class, (2) upheld the NVRA as

6    constitutional, (3) permanently enjoined the state from violating the NVRA, (4) ordered the state

7    to propose a plan for implementing the NVRA, and (5) postponed determining "the claims of the

8    Voting Rights Coalition regarding past and future conduct by the State of California and Governor

9    Wilson with respect to implementing the NVRA."[18] California submitted its proposed

10   implementation plan, which specified that persons who received an application to renew their

11   driver's license by mail "will be mailed a regular voter registration card with their renewal notice.

12   . . . This will be the Secretary of State's 'generic' registration form which is returnable to the

13   Secretary of State."[19] The plan included copies of the renewal-by-mail form and prepaid voter

14   registration card.[20]

15       In May 1995, the district court adopted the State's proposed plan, ordered its implementation

16   within 45 days, defined a process for filing a joint statement with any objections, and scheduled a

17   hearing to address objections.[21] The parties submitted a joint statement identifying their disputes

18   about forms and procedures.[22] The plaintiffs objected to aspects of the proposed plan but did not

19   challenge the renewal-by-mail form.[23] In its subsequent ruling, the district court noted that the

20

21

---

22   [15] *Id.* at 16 (¶ 43).

     [16] *See Wilson v. United States*, No. 95-CV-20042-JW.

23   [17] Consolidation Order, Ex. 3 to RJN – ECF No. 23-3.

24   [18] Defendants' Supporting Brief– ECF No. 22 at 9 (citing *Voting Rights Coalition v. Wilson*, 60 F.3d 1411 (9th Cir. 1995); *see also* Order and Injunction, Ex. 2 to RJN – ECF No. 23-2 at 8–9.

25   [19] Proposed Implementation Plan, Ex. 4 to RJN – ECF No. 23-4 at 32.

26   [20] *Id.* at 44–52.

     [21] Order, Ex. 5 to RJN – ECF No. 23-5.

27   [22] *See* Joint Statement, Ex. 6 to RJN – ECF No. 23-6.

28   [23] *Id.*

1 parties had resolved all of their disputes regarding implementation except those raised explicitly in

2 the plaintiffs' motion for further relief (again, unrelated to the renewal-by-mail form).[24]

3     The court later ordered California to submit compliance reports for three years and a final

4 implementation plan.[25] California made no changes to the renewal-by-mail form in its final

5 implementation plan.[26] In June 1998, the district court entered final judgment permanently

6 enjoining California from "failing to enforce" the NVRA, and in June 1999, it terminated its

7 supervision of California's implementation of the NVRA.[27]

8     The defendants assert that DMV's current renewal-by-mail registration process is largely

9 unchanged from the process in the initial and final implementation plans in the prior lawsuit.[28]

10

11 **3. Allegations in the Complaint**

12     The plaintiffs — the League of Women Voters of California, ACCE Institute, California

13 Common Cause, and National Council of La Raza — are non-profit organizations working to

14 encourage civic engagement, public participation, and voter turnout in communities throughout

15 California.[29] The League of Women Voters of California has 7,478 individual members involved

16 in more than 60 chapters throughout the state.[30] ACCE Institute has more than 14,000 members

17 and operates six offices throughout the state to support its voter registration programs.[31] California

18 Common Cause has approximately 100,000 members and offices in Oakland, Sacramento, and

19 Los Angeles.[32] National Council of La Raza operates regional offices throughout California and

20

21

22 [24] Order Re: Motion for Further Relief, Ex. 7 to RJN – ECF No. 23-7 at 3.

23 [25] Order Re: Compliance Reports, Ex. 8 to RJN – ECF No. 23-8.

[26] Final Implementation Plan, Ex. 9 to RJN – ECF No. 23-9.

24 [27] Judgment, Ex. 9 to RJN – ECF No. 23-9; Order Re: Supervision, Ex. 11 to RJN – ECF No. 23-11.

25 [28] *See* Defendants' Supporting Brief– ECF No. 22 at 11.

26 [29] Compl. – ECF No. 1 at 3–6 (¶¶ 7–19).

[30] *Id.* at 3 (¶ 7).

27 [31] *Id.* at 4 (¶¶ 12–13).

28 [32] *Id.* at 5 (¶ 15).

1    has 62 affiliated organizations working in communities throughout the state.[33]

2        The plaintiffs allege that the DMV's use of a separate voter-registration form is not the

3    "integrated application process required by law."[34] Also, it "asks applicants to again provide

4    information that they have already given to the DMV including the applicant's name, driver's

5    license number, Social Security number, date of birth, and address." DMV's use of a separate

6    voter-registration form "imposes unnecessary and burdensome hurdles on the subset of these

7    renewal applicants who wish to register to vote . . . ."[35] California's forms and procedures "may

8    have contributed to the state's overall low voter-registration rate."[36]

9        The League of Women Voters, ACCE Institute, and California Common Cause all believe that

10   their memberships include "persons who have sought to renew a driver's license or state

11   identification card by mail and are eligible to vote but unregistered, or who need to update their

12   voter registration"[37] and who "continue to suffer harm when they attempt to renew a driver's

13   license or state identification card by mail and wish to register or update their voter registration

14   data."[38] "Moreover, the members of these organizations have been denied the opportunity to

15   register to vote in violation of the NVRA"[39] and will suffer irreparable injury because they are

16   "deprive[d] of the opportunity to register to vote or update their registrations in accordance with

17   the NVRA each time they engage in a driver's license or identification card transaction . . . ."[40]

18       The League of Women Voters, ACCE Institute, and California Common Cause allege that, as

19   a result of the alleged NVRA violations, they "have been forced to expend resources on providing

20   voter registration assistance to California citizens rather than on other activities related to their

21   organizational missions" and they will suffer irreparable injury because "they will continue to be

22

23   [33] *Id.* at 5 (¶ 18).

     [34] *Id* at 2 (¶ 3).

24   [35] *Id.* at 10 (¶ 42).

25   [36] *Id.* at 11 (¶ 45).

     [37] *Id.* at 3–5 (¶¶ 7, 12, 15).

26   [38] *Id.* at 4–5 (¶¶ 10, 14, 17).

27   [39] *Id.* at 3 (¶ 5).

28   [40] *Id.* at 11–12 (¶ 47).

forced to divert resources to register voters who should have been registered through the DMV

and to budget for future diversion for the same reason."[41] They allege that they diverted resources

away from other mission-driven activities — such as community outreach, education, and direct

advocacy on local and statewide ballot initiatives and direct advocacy before local and state

government agencies to build the organizations and further their missions and goals — to voter-

registration due to California's non-compliance with the NVRA.[42]

The National Council of La Raza deepens its efforts to engage voters and encourage voters

during election cycles.[43] In 2016, it "worked in high schools and through its network of California

service providers to register hundreds of Californians to vote."[44] This "took time, staff, and money

that otherwise would have been spent educating voters and encouraging voter turnout and civic

engagement."[45]

## GOVERNING LAW FOR MOTIONS TO DISMISS

The defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1)

for lack of standing and under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

### 1. Rule 12(b)(1) Standard

A complaint must contain a short and plain statement of the ground for the court's jurisdiction.

Fed. R. Civ. P. 8(a)(1). The plaintiff has the burden of establishing jurisdiction. *See Kokkonen v.*

*Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Farmers Ins. Exch. v. Portage La*

*Prairie Mut. Ins. Co.*, 907 F.2d 911, 912 (9th Cir. 1990).

A defendant's Rule 12(b)(1) jurisdictional attack can be either facial or factual. *White v. Lee*,

---

[41] *Id.* at 3 (¶ 5), 12 (¶ 48); *see also id.* at 3–6 (¶¶ 8, 13, 16, 19) (expending resources through staff, volunteer, and other resources — resources that could have been spent on other mission-related activities — when those eligible voters should have been offered NVRA-compliant voter registration services through DMV).

[42] *Id.* at 4–6 (¶¶ 9, 13, 16, 19).

[43] *Id.* at 5 (¶ 18).

[44] *Id.* at 6 (¶ 19).

[45] *Id.*

227 F.3d 1214, 1242 (9th Cir. 2000). "A 'facial' attack asserts that a complaint's allegations are themselves insufficient to invoke jurisdiction, while a 'factual' attack asserts that the complaint's allegations, though adequate on their face to invoke jurisdiction, are untrue." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780, n.3 (9th Cir. 2014). This is a facial attack; the court thus "accept[s] all allegations of fact in the complaint as true and construe[s] them in the light most favorable to the plaintiffs." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

Standing pertains to the court's subject-matter jurisdiction and thus is properly raised in a Rule 12(b)(1) motion to dismiss. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121–22 (9th Cir. 2010).

## 2. Rule 12(b)(6) Standard

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a claim for relief above the speculative level . . . ." *Id.* (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, "'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

1    If a court dismisses a complaint, it should give leave to amend unless the "the pleading could

2    not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal.*

3    *Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

4

5                                              **ANALYSIS**

6    **1.   Standing**

7        Federal-court jurisdiction extends only to "cases" and "controversies." *Raines v. Byrd*,

8    521 U.S. 811, 818 (1997). "Standing to sue is a doctrine rooted in the traditional understanding of

9    a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

10       To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly

11   traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

12   favorable judicial decision." *Id.* (citing *Lujan v Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

13       An association has standing to sue on behalf of its members when "[(1)] its members would

14   otherwise have standing to sue in their own right, [(2)] the interests at stake are germane to the

15   organization's purpose, and [(3)] neither the claim asserted nor the relief requested requires the

16   participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl.*

17   *Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). As the party invoking the court's jurisdiction, the

18   plaintiff has the burden of establishing standing. *Spokeo*, 136 S. Ct. at 1547.

19       The issue here is whether the plaintiffs have Article III standing, either organizational (or

20   direct) standing based on a diversion-of-resources theory or associational standing based on injury

21   to their members.

22

23   **1.1 Direct Standing**

24       An organization has "direct standing to sue" when it shows "'a drain on its resources from

25   both a diversion of its resources and frustration of its mission.'" *Fair Hous. of San Fernando*

26   *Valley v. Rommate.com*, 666 F.3d 1216, 1219 (9th Cir. 2012) (quoting *Fair Hous. of Marin v.*

27   *Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). The organization's "standing must be established

28   independent of the lawsuit filed by the plaintiff." *Id.* "An organization 'cannot manufacture the

*United States District Court*
*Northern District of California*

1    injury by incurring litigation costs or simply choosing to spend money fixing a problem that

2    otherwise would not affect the organization at all.'" *Valle del Sol Inc. v. Whiting,* 732 F.3d 1006,

3    1018 (9th Cir. 2013) (quoting *La Asociasion de Trabajadores de Lake Forest v. Lake Forest,*

4    624 F.3d 1083, 1088 (9th Cir. 2010)).

5         Here, the plaintiffs allege that they diverted resources to register voters rather than spending

6    time, staff, and money on other activities relating to their organizational missions. These

7    allegations are similar to those in *National Council of La Raza v. Cegavske*, where the court found

8    standing. 800 F.3d 1032, 1039, 1041 (9th Cir. 2015). There, Nevada allegedly failed to comply

9    with the NVRA's requirement to distribute voter-registration materials at — and to make

10   assistance available to people who visit and make certain requests of — public-assistance offices.

11   *Id.* at 1034–35. The non-profit plaintiffs alleged that the NVRA violation caused them to expend

12   additional resources, and that but for the violation, they would have spent the resources to

13   accomplish other aspects of their organizational missions, such as registering voters not covered

14   by the NVRA. *Id.* at 1039. These allegations — that they "changed their behavior" because of the

15   alleged violations and "expended additional resources that they would not otherwise have

16   expended, and in ways that they would not have expended them" — established an injury

17   attributable to Nevada's noncompliance and thus satisfied Article III standing. *Id.* at 1040–41.

18   *National Council of La Raza* controls the outcome here. The plaintiffs allege organizational

19   (direct) standing sufficiently.

20        The weight of other Ninth Circuit authority supports this conclusion. In Fair Housing Act

21   cases, the Ninth Circuit has found similar allegations sufficient at the pleading stage to show a

22   drain on resources both from a diversion of resources and a frustration of an organization's

23   mission. For example, in *Fair Housing of San Fernando Valley*, the Fair Housing Council

24   investigated Roommate.com's alleged violations of the Fair Housing Act (in the form of questions

25   regarding applicant's sex, sexual orientation, and familial status) and in response, started new

26   education and outreach campaigns targeted at discriminatory roommate advertising. 666 F.3d at

27   1219. In *Fair Housing of Marin*, the non-profit organization investigated housing discrimination

28   based on race; it sustained an injury beyond litigation expenses in the form of harm to its ability to

United States District Court
Northern District of California

1    provide outreach and education. *See* 285 F.3d at 904–05.

2        The defendants' citation to *Scott v. Schedler* does not compel a contrary result.[46] 771 F.3d 831,

3    837 (5th Cir. 2014). There, at trial, where the plaintiffs had to prove standing, the court held that

4    the NAACP had standing to sue for the state's failure to provide voter forms at social-services

5    agencies — because it had diverted resources to help persons register there — but it did not prove

6    standing for the state's failure to provide forms to voters registering online because there was no

7    evidence that the NAACP diverted resources to assist online registrants. 771 F.3d at 836–37. Thus,

8    there was "no relationship between the NAACP's request for injunctive relief and [the state's]

9    treatment of remote transactions . . . ." *Id.*

10       At the pleadings stage, the court accepts the factual allegations as true. And at the pleadings

11   stage, the standard requires that the plaintiffs allege a causal connection between the defendants'

12   alleged NVRA violations and their reactions to them. They have done so by alleging that they

13   diverted resources to "register voters who should have been registered through the DMV."[47] The court

14   denies the motion to dismiss for lack of direct standing.

15

16       **1.2 Associational Standing**

17       The plaintiffs (except for National Council of La Raza) assert claims on behalf of their

18   members based on their "belief" that they have injured members. The defendants argue that

19   "belief" is not enough, and the plaintiffs in any event must identify their injured members by

20   name.[48]

21       In *National Council of La Raza*, the Ninth Circuit addressed whether an organization must

22   identify its members by name to establish associational standing and said: "We are not convinced

23   that *Summers*, an environmental case brought under the National Environmental Policy Act,

24   stands for the proposition that an injured member of an organization must always be specifically

25

26   _____

27   [46] *See* Defendants' Supporting Brief– ECF No. 22 at 22–25.

     [47] Compl. – ECF No. 1 at 12 (¶ 48).

28   [48] Defendants' Supporting Brief– ECF No. 22 at 21.

1  identified in order to establish Article III standing for the organization." 800 F.3d at 1041 (citing

2  *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)). "Where it is relatively clear, rather than

3  speculative, that one or more members have been or will be adversely affected by a defendant's

4  action, and where the defendant need not know the identity of a particular member to understand

5  and respond to an organization's claim of injury, we see no purpose to be served by requiring an

6  organization to identify by name the member or members injured." *Nat'l. Council of La Raza*, 800

7  F.3d at 1041. The Ninth Circuit thus held that the organizations had standing even though they did

8  not identify their members by name. *Id.* at 1037, 1041–42 (citing *Ala. Legislative Black Caucus v.*

9  *Alabama*, 135 S. Ct. 1257, 1269 (2015) (finding it highly likely that statewide organization with

10  members throughout the state had injured members).

11     A plaintiff does not need to plead its evidence; it needs only to allege a claim plausibly.

12  The court cannot discern why — at the pleadings stage — the identity of particular members is

13  required for fair notice of the claims.

14     That said, the plaintiffs allege only their "belief" that members were injured. While other

15  allegations state more concretely that members were injured, those allegations are grounded on the

16  predicate allegation that the plaintiffs believe that they have members who were injured. On this

17  record, with the three organizations that allege associational standing, and without more context,

18  the court cannot conclude that this allegation establishes that it is "relatively clear, rather than

19  speculative" that the plaintiffs' members are injured. *Nat'l Council of La Raza*, 800 F.3d at 1041.

20  The court dismisses the complaint for lack of associational standing but with leave to amend.

21

22  **2.  Failure to State a Claim**

23     The state contends that the DMV's renewal-by-mail process satisfies section 20504(c)(1)'s

24  requirement that "[e]ach State shall include a voter registration application form for elections for

25  Federal office as part of an application" for a driver's license.[49] It sends a voter-registration form

26  with the DMV renewal form in a single envelope, thereby providing the simultaneous applications

27

28  [49] *Id.* at 14.

ORDER – No. 17-cv-02665-LB                14

1   for voter registration and a driver's license that the Act requires. *Id.* §§ 20503(a)(1) & 20504

2   (title). And it argues that there is no prohibited "duplication" because the DMV form is preprinted

3   with identifying information, and thus the applicant needs to fill out identifying information (on

4   the voter-registration form) only once.[50]

5       The plaintiffs do not dispute that two forms might meet the statutory standard (excerpted

6   above) for an "application made simultaneously with an application for a motor vehicle driver's

7   license."[51] *Id.* § 20503(a)(1). Instead, they argue that the process here does not comply with the

8   statute for the following reasons. The blank voter-registration form requires duplicate and

9   unnecessary information already set forth in the DMV renewal form (including name, address, and

10  driver's license number) and in the DMV's records (including social-security number and date of

11  birth). This violates the NVRA's requirement that the "voter registration application portion of an

12  application for a State motor vehicle driver's license — (A) may not require any information that

13  duplicates the information required on the driver's license part of the form" other than a second

14  signature and an attestation of eligibility to vote.[52] *Id.* § 20504(c)(2)(A). It also is not a

15  "simultaneous application to vote."[53] *Id.* §20504(a)(1). It does not serve as a single change-of-

16  address form. *Id.* § 20504(d). And it does not provide only the minimum amount of information

17  necessary to prevent duplicate registrations and enable the Secretary to assess the applicant's

18  eligibility and to administer voter registration.[54] *Id.* § 20504(c)(2)(B).

19      The plaintiffs plead a plausible claim. The statute's plain language does not require one form.

20  For example, section 20504(c)(1) refers to two applications. (The plaintiffs said at the hearing that

21  they do not advance this as a theory.) Indeed, the legislative history reflects that Congress intended

22  that states have the flexibility to use two forms. H.R. Rep. No. 103-9, at 9 (1993) (section 20504

23  "permits the use of two forms, one for the motor vehicle driver's license application and one for

24

---

25  [50] *Id.* at 17.

26  [51] They said this at the hearing.

    [52] Opposition – ECF No. 26 at 10.

27  [53] *Id.*

28  [54] *Id.*

ORDER – No. 17-cv-02665-LB                15

1   the voting registration application, thereby avoiding any cost associated with revamping current

2   procedures or computer programs."); S. Rep. No. 103-6, at 5–6 (1993). But on the statute's face,

3   as illuminated by the legislative history, the contemplated process is a non-duplicative, integrated

4   process. There are categories of information here that are duplicated on the voter-registration

5   form. *See* 52 U.S.C. § 20504(c)(2)(A).

6       The defendants nonetheless argue that the applicant must fill out only one form (the voter-

7   registration form) and thus is not "duplicating" information.[55] The court cannot square that

8   argument with the following: "[T]he voter registration application portion of an application for a

9   State motor vehicle driver's license — (A) may not require any information that duplicates

10  information required in the driver's license portion of the form (other than a second signature or

11  other information necessary under subparagraph (C))." *Id.* § 20504(c)(2)(A).

12      Considering Congress's goals in enacting the statute, and at the pleadings stage, the plaintiffs

13  state a claim.

14

15  **3. Res Judicata**

16      The defendants argue that the plaintiffs' claims are barred by res judicata. It does not argue

17  that the doctrine kills the case: it advances the arguments only against the common plaintiffs to the

18  two lawsuits (League of Women Voters and California Common Cause) and to the extent that the

19  entity defendants seek to vindicate individual rights.[56] Because the court finds that the plaintiffs

20  have not pled associational standing merely by alleging their belief that members are injured, the

21  court does not reach the issue of res judicata for the individual members. And because the case

22  survives as to at least two entity plaintiffs, the court thinks that its efforts are better deferred until

23  the plaintiffs file any amended complaint.

24      This conclusion is buttressed by footnote 23 in the defendants' motion. There, they mention

25  California's establishment of the "California New Motor Voter Program."[57] Under the new

26                     

27  [55] Defendants' Supporting Brief– ECF No. 22 at 17–18.

    [56] *Id.* at 18.

28  [57] *Id.* at 17–18 n.23 (citing Assemb. B. 1461, 2015–2016 Reg. Sess. (Cal. 2015)).

1  program, and unless the applicant opts out, an applicant's motor-vehicle records will constitute a

2  completed voter-registration affidavit and will be sent electronically to elections officials.[58] As a

3  result, DMV will phase out and replace its current process and forms.[59]

4      The court suggested at the hearing that the parties' interests are advanced best by staying the

5  case, given that the new program and DMV forms apparently will moot the lawsuit.[60]

6

7                          **CONCLUSION**

8      The court denies the Rule 12(b)(1) motion to dismiss for lack of direct standing, grants the

9  motion to dismiss for lack of associational standing without prejudice, denies the Rule 12(b)(6)

10  motion for failure to state a claim, and defers consideration of the res judicata issue until the

11  plaintiffs file any amended complaint. The plaintiffs must file any amended complaint by

12  September 21, 2017.

13      The court directs the parties to confer and file a joint statement within two weeks that

14  addresses whether the plaintiffs will file an amended complaint, the impact on the timing

15  of the court's consideration of res judicata, and the parties' views on staying their case

16  until California implements its new DMV program.

17      **IT IS SO ORDERED.**

18      Dated: August 25, 2017

19                                    LAUREL BEELER
                                  United States Magistrate Judge

20

21

22

23

24

25

26  _____

27  [58] *Id.* (citing AB 1461).
[59] *Id.*

28  [60] *See* Post-Hearing Joint Letter – ECF No. 31 (parties are conferring on this issue).